11 MARVIN, Chief Judge.
Lynn Ray Wells, originally charged with forcibly raping his girlfriend’s 21-year-old daughter, appeals his conviction by a jury of attempted forcible rape, claiming the evidence is insufficient to establish that he had specific intent to rape the victim, an essential element of the attempted offense. La. R.S. 14:42.1, 14:27. Though not required to do so to preserve the sufficiency issue for appellate review, Wells filed a motion for post-verdict judgment of acquittal in the trial court, which was denied. La.C.Cr.P. arts. 821, 920; State v. Green, 28,994 (La.App.2d Cir. 2/26/97), 691 So.2d 1273.
Wells’ second assignment of error concerning his adjudication as a second felony offender was not briefed and is deemed abandoned. URCA Rule 2-12.4; State v. Lewis, 577 So.2d 799 (La.App. 2d Cir.1991), writ denied. Wells does not complain of his sentence to 13 years at hard labor.
Finding the evidence sufficient to convict and no errors patent, we affirm.
ELEMENTS OF OFFENSE
An attempted forcible rape is committed when the offender has the specific intent to commit forcible rape, defined below, and does or omits an act for the purpose of and tending directly toward the accomplishing of his object, regardless of whether he would have actually accomplished his purpose under the particular circumstances. La. R.S. 14:27; State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied; State v. Bryant, 607 So.2d 11 (La.App. 2d Cir.1992), writ denied. Specific intent is present when the circumstances indicate that the offender actively desired the prescribed criminal consequences to' follow his act or failure to act. § 10(1).
Forcible rape is defined as vaginal or anal sexual intercourse which is deemed to be *660 without the victim’s consent because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where |2the victim reasonably believes that such resistance would not prevent the rape. § 42.1. As with other types of rape, emission is not necessary and any vaginal or anal penetration, however slight, is sufficient to complete the crime. § 41.
The presence or absence of specific intent is a question of fact, to be resolved by the trier of fact on the basis of inferences which may reasonably be drawn from the circumstances of the incident and the defendant’s conduct. This court reviews a finding of specific intent under the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), by asking whether the evidence, when viewed in the light most favorable to the prosecution, allows a rational trier of fact to find that the requisite intent was established beyond a reasonable doubt. Doby, Bryant, cited supra.
FACTS
At the time of the offense in April 1995, the 39-year-old Wells had been living with Mercy Thomas, the victim’s mother, Mercy’s 21-year-old daughter Ericka, and Ericka’s three-year-old son for several years. Wells and Mercy Thomas shared the back bedroom of the home. Ericka occupied the front bedroom. A third bedroom intended for Erie-ka’s son had not yet been furnished, and the boy slept in one of the other two bedrooms, with either his mother or his grandmother.
On the night of April 29, 1995, Mercy and her grandson were asleep in the back bedroom when Wells awoke Ericka in the front bedroom around 10:00 p.m. to obtain the telephone or pager number of Erieka’s former boyfriend, from whom Wells desired to buy illegal drugs. Ericka gave Wells the information he requested and went back to sleep after hearing Wells conversing with her former boyfriend outside the home around 10:30.
A few hours later, between midnight and 1:00 a.m. on April 30, Wells returned to Ericka’s bedroom and awoke her again by placing his hand over her |3mouth and a kitchen knife to her throat, telling her to “pull her pants down” and saying, “Don’t scream, don’t move, [or] else I’m going to kill Mercy and your son.” Ericka did as she was told without attempting to resist Wells, explaining to the jury that she knew he was armed with a knife and she feared that he would harm her and perhaps her mother and her son if she did not comply.
Once Ericka was partially undressed, Wells pulled his pants down and got on top of her, placing the knife at his side while keeping his hand over her mouth. Ericka testified that Wells tried to insert his penis into her vagina but did not succeed because she was “dry” and his penis was not fully erect. Wells licked her vagina one time “so he could make it wet” and again tried to put his penis into her vagina “but it wouldn’t go in, once again.” He then told her to “play with” his penis using her hand, which she did. Notwithstanding her manual stimulation, his penis still did not become fully erect and his third attempt to place it into her vagina also failed. Wells then told Ericka to “suck” his penis. She refused, telling him she “didn’t do that” and asking him why he was “doing this” to her. Wells then seemed to “realize what he was doing,” according to Ericka, and ceased his efforts, telling her to get dressed and to go with him to her mother’s bedroom.
Ericka’s mother and son were asleep in the back bedroom when Ericka entered the room with Wells, who carried the knife at his side. The television and radio in the back bedroom were both turned up loud, notwithstanding Mercy’s testimony that both had been turned off when she and her grandson went to sleep that night. After Ericka awakened her mother, Wells said, “Mercy, I raped Ericka.” Wells apologized to Ericka and her mother and briefly detained them in the back bedroom, where he threatened to kill himself, before allowing them to leave the house around 1:30 a.m.
When police arrived at the house between 2:00 and 3:00 a.m., after interviewing Ericka at the hospital, Wells had confined himself to the back |4bedroom of the house and refused to come out, telling the officers that he “was not coming out alive” and that he “was not going back to jail,” according to the Shreve *661 port Police Department’s hostage negotiator who arrived at the house around 3:15 that morning. Some six hours later, about 9:45 a.m., Wells calmly surrendered to police, who then searched the home, finding two knives and a handgun in the back bedroom and a blood-stained pillowcase on the bed in Ericka’s bedroom.
The stains on the pillowcase were scientifically tested and compared with blood samples taken from Wells and from Erieka, who did not realize she had been cut with the knife until others noticed some superficial “red marks” or “scratch marks” on her neck after the attack. The state’s expert in serology, DNA analysis and blood spatter analysis testified that the blood on the pillowcase matched Ericka’s blood, and explained that the stains were consistent with the victim having been asleep with her head on the pillow and receiving minor cuts to her neck when the attacker placed the knife to her throat.
The doctor who examined Erieka at the hospital found no visible signs of trauma in or around her vagina and no evidence of semen in the vaginal washings and tissue swabs taken for microscopic examination. These apparently negative physical findings did not rule out the possibility of rape, according to the doctor’s testimony, and were consistent with Ericka’s statements that her assailant used a weapon to prevent her from resisting and did not ejaculate.
According to the medical report, Erieka told the doctor that her stepfather “penetrated her vagina and began to rape her for about 30 minutes” before losing his erection. She told the investigating police officer that Wells’ penis “touched” her vaginal area; that he “tried several times” to penetrate her; and that “he was not successful twice but once he was able to halfway.” She gave similar testimony at trial, saying Wells initially got his penis “halfway to the lips” of her vagina “but 1 snot all the way, because I was dry [and] he was not all hard.” She said he “didn’t go all the way in me” at any time, even after he performed oral sex on her and she manually stimulated his penis. Erieka testified that the duration of the encounter “wasn’t [as] long” as her initial estimate to the doctor of 30 minutes, explaining that she was “confused and upset” when she gave that estimate.
These inconsistencies in Ericka’s testimony on the issue of penetration obviously contributed to the jury’s determination that Wells committed only an attempted forcible rape and did not complete the offense. The narrow issue on appeal is whether the evidence sufficiently establishes that Wells intended to complete the offense, an essential element of attempt as explained above.
DISCUSSION
Wells contends the evidence shows only “that he may have touched the victim’s vagina with his hand, mouth and penis; it did not come anywhere close to proving that he specifically wanted to rape her.” Wells claims the evidence establishes, at best, the offense of sexual battery, and complains that the victim was not a credible witness. On this record, we cannot agree.
Aside from the penetration issue, discussed supra and resolved by the jury in Wells’ favor, the victim’s trial testimony about what occurred was generally consistent in all material respects with her initial statements to the doctor and to the police. The jury’s decision to accept or reject the testimony of a witness in whole or in part, when reasonably supported by the record, is not to be second-guessed on appeal. Instead, the reviewing court simply asks whether the evidence deemed credible by the jury is legally sufficient to establish each essential element of the offense beyond a reasonable doubt. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied; State v. Jenkins, 456 So.2d 174 (La.App. 2d Cir.1984), writ denied. The testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to meet the state’s burden of proof. State v. Lewis, supra; State v. Bailey, 585 So.2d 1245 (La.App. 2d Cir.1991).
The evidence reasonably deemed credible by the jury here shows that Wells used a knife and threatened to harm Ericka’s mother and son if she did not comply with his order to “pull her pants down” when he awakened her in her bed, apparently after *662 turning the television and the radio in the back bedroom on at a high volume to mask whatever sounds he or Ericka made in the front bedroom. He kept Ericka’s mouth covered to prevent her from calling for help. Once the two were partially undressed, he got on top of her and tried to insert his penis into her vagina, being unable to do so because of physical factors (her “dryness” and his lack of an erection) which he then actively attempted to alter, first by licking her vagina and then by telling her to “play with” his penis with her hand. These forms of sexual “touching” were clearly not ends in themselves, as each was followed by another attempt by Wells to insert his penis into Ericka’s vagina.
From these actions and circumstances, it is reasonable to infer that Wells intended to have vaginal sexual intercourse with Ericka without her consent, using force and threats of physical violence to prevent her from resisting the attack, notwithstanding that he did not achieve the desired result. The evidence in the record is sufficient to allow a rational trier of fact to find proof of each essential element of attempted forcible rape, including the element of specific intent to complete the rape, beyond a reasonable doubt. See and compare Doby and Bailey, cited supra.
DECREE
The conviction is AFFIRMED.